VINCENT PELLICCIONE *v.* PLANNING AND ZONING COMMISSION OF THE TOWN OF RIDGEFIELD
(AC 20361)

Mihalakos, Flynn and Healey, Js.

Argued February 20—officially released July 17, 2001

*Thomas W. Beecher*, for the appellant (defendant).

*Robert A. Fuller*, for the appellee (plaintiff).

*Opinion*

HEALEY, J. The defendant planning and zoning commission of the town of Ridgefield (commission) appeals from the judgment of the trial court sustaining the appeal by the plaintiff, Vincent Pelliccione, from the commission's denial of his resubdivision application.[1] On appeal, the commission contends that the court improperly (1) concluded that its denial of the plaintiff's resubdivision application was unsupported by the record and (2) substituted its judgment for that of the commission. We reverse the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of the commission's appeal. On August 26, 1998, the plaintiff, the owner of certain land on Ledges Road in Ridgefield, submitted a resubdivision

---

[1] The resubdivision application was combined with an inland wetlands application concerning an intermittent watercourse draining to Ledges Road in Ridgefield, which was heard at the same time as the resubdivision application. Both the resubdivision and inland wetlands applications simultaneously were denied on December 22, 1998. The denial of the inland wetlands application, however, is not part of this appeal.

application to the commission,[2] seeking approval for four building lots. Public hearings for the plaintiff's applications were conducted by the commission on September 22, 1998,[3] and November 17, 1998.

At the September 22, 1998 hearing, the commission expressed concerns regarding the steep slope of the property[4] and the preservation of the existing features of the land.[5] The plaintiff acknowledged that the slope of certain land involved in the resubdivision application was an issue "in particular" that previously had been considered. At that hearing, a letter to the commission, regarding the plaintiff's application, from the Ridgefield conservation commission was read. In part, the letter stated: "[T]he applicant is attempting to put houses on land with grades running 35% to 70%." The letter advocated denial of the applications "unless more detail[s] . . . are provided and satisfactorily address

[2] Appendix A, art. I, § 1-2, of the Ridgefield subdivision regulations provides in relevant part that "[n]o subdivision of land shall be made until a plan for such subdivision has been approved by the Commission. . . ."

[3] Prior to the public hearing, members of the commission held a site walk on the subject property on September 13, 1998.

[4] Pursuant to appendix A, art. IV, § 4-18, of the Ridgefield subdivision regulations, "[t]he lot arrangement shall be such as to minimize foreseeable difficulties, for reasons of topography or other conditions, in securing building permits to build on all lots in compliance with the applicable zoning regulations and sanitary regulations, and in providing safe driveway access to buildings on such lots. The applicant must demonstrate to the Commission that cuts, fills and grades necessary to utilize the lots will not result in unsafe driveways or adversely affect adjacent properties, and that graded areas shall have a slope not exceeding one foot vertical in 2 feet horizontal, unless ledge rock prevents."

[5] Appendix A, art. IV, § 4-31, of the Ridgefield subdivision regulations provides in relevant part that "[t]he commission may require that existing features which would add value to the development or to the town as a whole, including, but not limited to, trees, watercourses, ridge tops or ridge lines and similar irreplaceable assets, shall be preserved through harmonious design of the subdivision. The commission may make reasonable modifications in standards for layout of streets and lots to accomplish such purposes, including protective screening. . . . Slopes and ledges not suitable for such treatment shall not be disturbed and shall remain in their natural state."

the many problems created by the extraordinarily steep grades." In the same letter, the conservation commission wrote about what it called the "very steep" condition on the property and stated that "extraordinary measures will be required to stabilize these slopes."

Dainius L. Virbickas, an engineer from Tyree Engineering, P.C., the firm that prepared the plans filed by the plaintiff, also spoke at the September 22, 1998 meeting. When asked by a commission member about the plans to stabilize the steep slopes on the property, Virbickas replied, "Right now, we have just shown one to one slopes to be stabilized with riprap, but as one of the letters had mentioned, we probably will encounter ledge and probably will have that to face as our slope." A commission member also questioned Virbickas about whether borings had been conducted to determine the extent of the ledge that might be encountered. Virbickas answered, "Not yet, not yet. The only machines that we have had out there were backhoes for septic system testing."

At the conclusion of the hearing, the commission directed the plaintiff to two sections of the subdivision regulations of the town of Ridgefield, appendix A, art. IV, §§ 4-18 and 4-31, which were read in full into the record. The commission decided to continue the hearing until a later date to enable the plaintiff to more fully address concerns raised with regard to the slope of the land, pursuant to § 4-18, and the preservation of existing features of the land, pursuant to § 4-31. The commission further instructed the plaintiff to provide more detailed information about the slope of the land and preserving the existing features, including the need for additional drawings, "at a minimum, twenty-scale drawings of each site, very detailed [including] landscaping necessary to stabilize the slopes." The hearing was then adjourned until November 17, 1998.

At the November 17, 1998 hearing, the plaintiff presented Mark Kornhaus of Tyree Engineering, P.C., who had the "renderings" that the commission had requested earlier. The plaintiff also introduced additional counsel.[6] The plaintiff, in discussing the maps and the property involved, as they were displayed before the commission, stated, "We are going to [explain] to you the grades on these lots. The driveway grades are actually fairly gentle, even though, of course, the slope of the property is *fairly steep as it goes up from the road*, as you know." (Emphasis added.)

Kornhaus also addressed the issue of the slope of the lots on behalf of the plaintiff and stated that as to ledge, they were "anticipating" that "we are going to hit rock on this site. In fact, it is very evident that there is ledge; there are actual outcrops there [which could be handled by] shelving it off at one to one and creating a retaining wall."[7] When asked by the commission how he could determine the nature of the ledge present on the lots so as to know to "do a one on one, and [whether] it is all just ledge, solid right through," Kornhaus replied, "When you are dealing with ledge, you never really know what you are going to get into until you actually uncover it. And what I am talking about is a fractured type of ledge [as distinguished from] something that is very solid, your granite type of bedrock." The commission then read to Kornhaus the last sentence of § 4-18 of the regulations and asked him whether "ledge rock and fractured rock" meant the same thing, to which Kornhaus answered, "Absolutely."

There appears to be no question that there were visible ledge outcroppings on the application site. The com-

---

[6] That new counsel, Robert A. Fuller, made the presentation for the plaintiff at the November, 1998 hearing and is the plaintiff's counsel on this appeal now before us.

[7] A commission member then stated: "But the retaining wall, of course, isn't a wall. It is just solid rock."

mission expressed concern, however, that the resubdivision application as presented apparently called for grading areas of a slope that exceeded the maximum provided in § 4-18. The commission also stressed to the plaintiff that it had reservations because there were locations on the new plans[8] that indicated grades of a slope of two on one where a one on one slope was proposed. The commission observed that "there is quite a difference between one on one and two on one, and two on one is what we require *unless ledge rock prevents* [that]. And I am having a problem now with what you expect to find there." Kornhaus stated, however, that he was "very confident that we are going to hit rock there. It is going to be a rock slope."

After that exchange, a commission member asked Kornhaus, "Just for the record, did you not say that you might find either solid, almost like granite type ledge or highly fractured ledge," and Kornhaus replied, "Right, that is a *possibility*." (Emphasis added.) After some further questioning and discussion,[9] the chairman closed the public hearing.

On December 22, 1998, the commission denied both applications and gave written reasons for its denial. One of the reasons given for denying the plaintiff's resubdivision application was that "[t]he applicant has not demonstrated that 'cuts, fills and grades necessary to utilize the lots will not result in unsafe driveways or adversely affect adjacent properties, and that graded areas shall have a slope not exceeding one foot vertical in 2 feet horizontal, unless ledge rock prevents,' as required by Section 4-18 of the Subdivision Regulations.

[8] The "new" plans, introduced by the plaintiff at the hearing of November 17, 1998, according to Kornhaus, were "new plans [that] address all the issues you have raised."

[9] During that hearing, certain commission members indicated their concern with what aggressive site disturbance would mean to the lots and to compliance with § 4-31 of the regulations.

No empirical evidence was offered to support the appli-
cant's assertion that grading to a 1:2 slope would be
prevented by ledge rock. The nature of the ledge rock
and soils of the slope is unknown since the applicant
stated that no borings were taken at the depth proposed
for excavation."

The plaintiff appealed to the trial court from the com-
mission's denial of his resubdivision application. The
court sustained the plaintiff's appeal. In sustaining the
plaintiff's appeal on the resubdivision application, the
court reasoned that the commission's conclusion "that
no evidence was offered to support the assertion that
ledge rock was present on the property or that ledge
rock affected the grading . . . is not supported by the
record."[10] This appeal followed.

The commission claims that the court improperly
concluded that its decision to deny the plaintiff's subdi-
vision application was unsupported by the record. Fur-
ther, the commission contends that the court
improperly substituted its judgment for that of the com-
mission in reversing the denial of the plaintiff's applica-
tion. We agree with the commission.

"It is axiomatic that a planning commission, in pass-
ing on a resubdivision application, acts in an administra-

---

[10] In sustaining the plaintiff's appeal, the court further stated: "The appli-
cant specifically addressed the grading plans and the need for a 1.1 slope
. . . . Furthermore, evidence was offered concerning the one to one slope
and the presence of ledge rock . . . . The commission concluded that no
evidence was offered to support the assertion that ledge rock was present
on the property or that ledge rock affected the grading. This conclusion is
not supported by the record. All accessway grades and driveway grades
comply with all subdivision regulations, consistent with § 14-12 of the Ridge-
field subdivision regulations. In the absence of specific information indicat-
ing a violation of the subdivision regulations, coupled with definite finding
of ledge rock requiring the grade adjustment, a standard requiring proof
sufficient to 'satisfy' the commission, cannot provide the basis for a denial
of the plaintiff's submission. *Helbig* v. *Zoning Commission*, 185 Conn. 294,
314, 440 A.2d 940 (1981). The plaintiff's appeal from the denial of his resubdi-
vision application is therefore sustained." (Citations omitted.)

tive capacity and is limited to determining whether the plan complies with the applicable regulations. . . . It is equally axiomatic that the trial court, in reviewing the action of a planning commission regarding a resubdivision application, may not substitute its judgment on the facts for that of the planning commission. . . . The conclusions of the commission must stand if even one of the stated reasons is reasonably supported by the record." (Citations omitted.) *R. B. Kent & Sons, Inc.* v. *Planning Commission*, 21 Conn. App. 370, 373, 573 A.2d 760 (1990). It is within the province of the commission to interpret and apply its zoning regulations. *Gorman Construction Co.* v. *Planning & Zoning Commission*, 35 Conn. App. 191, 195, 644 A.2d 964 (1994).

"The evidence, however, to support any such reason must be substantial . . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. . . . The substantial evidence rule is a compromise between opposing theories of broad or de novo review and restricted review or complete abstention. It is broad enough and capable of sufficient flexibility in its application to enable the reviewing court to correct whatever ascertainable abuses may arise in administrative adjudication. On the other hand, it is review of such breadth as is entirely consistent with effective administration. . . . [It] imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight

of the evidence or clearly erroneous action." (Citation omitted; internal quotation marks omitted.) *Quality Sand & Gravel, Inc.* v. *Planning & Zoning Commission,* 55 Conn. App. 533, 540, 738 A.2d 1157 (1999).

"The trial court must determine whether the commission has correctly interpreted its regulations and applied them with reasonable discretion to the facts. . . . The trial court can sustain the [plaintiff's] appeal only upon a determination that the decision of the commission was unreasonable, arbitrary or illegal . . . ." (Citations omitted; internal quotation marks omitted.) *Gorman Construction Co.* v. *Planning & Zoning Commission,* supra, 35 Conn. 195. "In reviewing the action of the trial court, we have to decide whether it could in logic and in law reach the conclusion that the [commission] should be overruled." (Internal quotation marks omitted.) *Daw* v. *Zoning Board of Appeals,* 63 Conn. App. 176, 180, 772 A.2d 755, cert. denied, 256 Conn. 931, 776 A.2d 1145 (2001).

With those principles in mind, we now address the issue of whether the court improperly concluded that the commission's decision was not supported by substantial evidence in the record.[11] In connection with that issue, we also will resolve the commission's claim that the court improperly substituted its judgment for that of the commission.

In overturning the commission's denial of the plaintiff's resubdivision application, the court stated that "[t]he commission concluded that no evidence was offered to support the assertion that ledge rock was present on the property or that ledge rock affected the

---

[11] The court's review was based on the record, which included the knowledge of commission members that was gained through personal observation of the site. See *Burnham* v. *Planning & Zoning Commission,* 189 Conn. 261, 267, 455 A.2d 339 (1983). In this case, the commission did "site walk" the premises involved.

grading." After thoroughly reviewing the record, we conclude that the court misinterpreted the commission's rationale in denying the plaintiff's application. We will discuss that further, but we state here that the court's statement is wide of the mark. The commission concluded that the plaintiff failed to present sufficient evidence to demonstrate that ledge rock prevented compliance with the slope requirements of § 4-18 and not that the plaintiff failed to present evidence that ledge rock existed in the first place.

There is substantial evidence in the record that reasonably supports the commission's conclusion that the plaintiff did not demonstrate that the exception, "unless ledge rock prevents," in § 4-18 applied here. To begin with, the plaintiff's application, including the new plans, delineated areas of grading that would have slopes in excess of the maximum of one foot vertical and two foot horizontal ratio permitted by § 4-18. It was the plaintiff's burden to demonstrate either that such areas met the requirements of § 4-18 or that he was within the "unless ledge rock prevents" exception from compliance with § 4-18.

It also is clear from § 4-18 that the *mere* presence of ledge rock is not dispositive, despite the court's suggestion, in demonstrating compliance with the regulation in obtaining the relief afforded the plaintiff by satisfying the exception of where ledge rock "prevents" compliance with the slope requirement of § 4-18. The court's concern with the *mere presence* of ledge rock is ill founded. In focusing solely on the presence of ledge rock, the court effectively ignored the "unless ledge rock prevents" language in the regulation in a factual context that clearly invokes it—and where, as the commission perceived, it was the only route for the plaintiff, under the circumstances of this case, to qualify for relief under § 4-18.

In his brief, the plaintiff claims that "[t]he testimony of the engineer and the maps are clear evidence of

ledge, allowing greater grading in those areas than one to two [foot] slopes if that could not be otherwise achieved during construction. On the other hand, there was no credible evidence supporting the absence of ledge." We do not agree with the plaintiff that his engineer, Kornhaus,[12] stated during the hearing that the presence of ledge rock "prevented" compliance with the one foot to two foot slope requirement of § 4-18. Moreover, the plaintiff fails to point to any statement or credible evidence from which it could be reasonably inferred that the presence of ledge rock on the lots prevented compliance with the § 4-18 requirements.

In reference to the ledge rock, Kornhaus, the plaintiff's expert engineer, stated that "there is apparent ledge and it is very evident here." He stated that "in the back of that house [there] is definite ledge. It is about to five to six feet down . . . it is coming out of the ground in outcrops." As to another site, he stated, "In fact, it is very evident that there is ledge; there are actually outcrops there." Kornhaus also stated, "I am very confident that we are going to hit rock there. It is going to be a rock slope." Again, this merely shows that there is ledge rock outcropping in various areas on the site of the lots in the application. When asked by the commission, however, "[j]ust for the record, did you not say that you *might* find either solid, almost like granite type ledge, or highly fractured ledge?" Kornhaus answered, "Right, that is a *possibility*." In the context of safety and stabilization vis-a-vis grading, one commission member stated that he assumed that it would be stable because of the rock. Kornhaus replied, "Right, because it is rock. Maybe these are some areas that *might* not be." (Emphasis added.)

The engineer's testimony was essentially conjectural and surmise. Contrary to the plaintiff's claim that there

---

[12] We assume here that the plaintiff refers to Kornhaus, the engineer for the plaintiff who spoke at the November 17, 1998 hearing.

is no countervailing evidence to that of the engineer, the commission, as the judge of credibility, "is not required to believe any witness, not even an expert." *Manor Development Corp.* v. *Conservation Commission,* 180 Conn. 692, 697, 433 A.2d 999 (1980); see *Laufer* v. *Conservation Commission,* 24 Conn. App. 708, 716, 592 A.2d 392 (1991). It was properly within the discretion of the commission to reject the engineer's evidence. In any event, Kornhaus never provided, nor can it be fairly implied that he stated, that the presence of ledge rock *prevented* compliance with § 4-18. Simply put, the expert Kornhaus' testimony did not give the commission any definitive information on the central issue of whether the presence of ledge rock *prevented* compliance with § 4-18.

Furthermore, the commission, during the November 17, 1998 hearing, reminded the plaintiff that at the earlier[13] public hearing, it had cautioned him about the need for more specific answers and notified him about its problems understanding the nature of the ledge on the property. More than once, the commission stressed the need for meaningful presentation in light of the language, "unless ledge rock prevents," in § 4-18.

In the challenged reason for denying the plaintiff's subdivision application, the commission stated the following: "No empirical evidence was offered to support the applicant's assertion that a grading to a 1:2 slope would be prevented by ledge rock. The nature of the ledge rock and soils of the slope is unknown since the applicant stated that no borings were taken at the depth proposed for excavation."[14] The word "empirical" is

[13] At that time, the commission read §§ 4-18 and 14-31 of the regulations aloud and indicated that they should be kept in mind in future presentations relative to the applications.

[14] It is somewhat anomalous that the new plans showed some plantings intended for some of the very areas that allegedly held ledge rock in disputed slope areas. One commissioner indicated that from the kind of the rock he had heard described, "I wouldn't expect those things would take hold at all."

defined as "[o]f, relating to, or based on experience, experiment, or observation." Black's Law Dictionary (7th Ed. 1999). It means "capable of being confirmed, verified, or disproved by observation . . . ." Webster's Third New International Dictionary.

The plaintiff had made some borings on those lots earlier, concerning septic systems, but no "borings were done at the depth proposed for excavation." At the first public hearing in September, 1998, Virbickas, the original engineer for the plaintiff, when asked if any borings had been taken concerning ledge rock responded, "Not yet, not yet." Although some seven weeks expired between the first and second public hearings, there was no evidence that any further borings had been taken at all between the two public hearings. There was no empirical data or evidence offered by the plaintiff.[15]

In examining the conclusion of the court, we review the facts on which the commission based its decision, keeping in mind that the reasons given for the commission's denial involved pertinent considerations required by the regulation § 4-18. We conclude that there was substantial evidence in the record to support the commission's findings and conclusion that the plaintiff had not sustained his burden of demonstrating that the exception to the slope requirement of § 4-18 applied to his application.

In addition, we conclude that the court improperly perceived its function in its review of the commission's decision on appeal when it substituted its judgment for that of the commission. The court's function was "to determine on the basis of the record whether substan-

---

[15] We do not mean to suggest that additional borings were the only type of "empirical" evidence that was acceptable. The point is that no other empirical evidence of any sort, as we have defined that term, was even attempted to be offered to the commission.

tial evidence has been presented to the [commission] to support its findings." *Mobil Oil Corp.* v. *Zoning Board of Appeals*, 35 Conn. App. 204, 209, 644 A.2d 401 (1994); see *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 540, 525 A.2d 940 (1987). Furthermore, a reviewing court cannot substitute its judgment as to the weight of the evidence before the commission and on factual issues material to the reasons for the commission's decision because it is within the province of the commission to determine the credibility of witnesses. *Whisper Wind Development Corp.* v. *Planning & Zoning Commission*, 32 Conn. App. 515, 523, 630 A.2d 108 (1993), aff'd, 229 Conn. 176, 640 A.2d 100 (1994). Not only is a reviewing court prohibited from substituting its judgment for that of the commission, but the decision of the commission must be sustained if an examination of the record discloses evidence that supports any one of the commission's reasons. *Irwin* v. *Planning & Zoning Commission*, 244 Conn. 619, 629, 711 A.2d 675 (1998); *Huck* v. *Inland Wetlands & Watercourses Agency*, supra, 203 Conn. 539–40. "The question is not whether the trial court would have reached the same conclusion but whether the record before the [commission] supports the decision reached. *Calandro* v. *Zoning Commission*, 176 Conn. 439, 440, 408 A.2d 229 (1979)." *Burnham* v. *Planning & Zoning Commission*, 189 Conn. 261, 265, 455 A.2d 339 (1983).

In this case, the court improperly substituted its judgment for that of the commission. It weighed the evidence and concluded that the evidence was sufficient to satisfy the requirements of § 4-18, despite the substantial evidence in the record supporting the commission's conclusion that the evidence was not sufficient to permit an exception to the slope requirements of that regulation.

The plaintiff counters that the court's decision should be upheld because the commission improperly interpre-

ted applied § 4-18 of its own subdivision regulations.[16] The plaintiff contends that, as to § 4-18, "[a] standard requiring proof sufficient to satisfy the commission is not a valid basis for refusing to approve an application." In similar fashion, he posits that "[a]n applicant does not have to present sufficient information as the agency members may require because that is a subjective standard without any reasonable parameters." Further, the plaintiff argues that the "cutting, filling and grading . . . applies to *actual* development of an approved lot and not to initial approval of lots in a subdivision. The grades are not determined until the lot is used and improved. [It is only at] that point [that] the necessary slope is obtained in graded areas."[17]

We consider the plaintiff's suggestion, directed to § 4-18, that "[a] standard requiring proof sufficient to satisfy the commission is not a valid basis for refusing to approve an application" and that "[a]n applicant does not have to present sufficient information as the agency members may require because that is a subjective standard without any reasonable parameters." The plaintiff, in discussing the two sentences that comprise § 4-18, claims that they must not be read so as to give the commission discretion to veto a lot at the subdivision approval stage because the applicant "who is not [actually] developing the lot at that stage, has not *conclusively proved* that grading during construction can obtain a 1 to 2 slope or that ledge rock will be encountered in *all graded areas* in sufficient amounts to allow a lesser grade." (Emphasis added.)

[16] Appendix A, art. IV, § 4-18, of the subdivision regulations has only two sentences.

[17] The clear implication of this branch of the plaintiff's claim is that it is not necessary, at the stage of the approval of his resubdivision application, for the commission to be concerned about the issue of slopes. The plaintiff fails to provide any analysis or authority for this bifurcated claim that consideration of this issue must await actual development of the lot. Accordingly, we reject that claim.

The subdivision regulations on which the commission, acting administratively, should rule must contain known and fixed standards applying to all cases of a like nature and must conform to the principle that a regulation, like a statute, cannot be too general in its terms. *Smith* v. *Zoning Board of Appeals*, 29 Conn. App. 28, 38, 614 A.2d 464 (1992), rev'd on other grounds, 227 Conn. 71, 629 A.2d 1089 (1993), cert. denied, 510 U.S. 1164, 114 S. Ct. 1190, 127 L. Ed. 2d 540 (1994). "A commission's regulations must be reasonably precise in subject matter and reasonably adequate and sufficient to give both the commission and those affected by its decision notice of their rights and obligations." (Internal quotation marks omitted.) Id.

In discussing that issue, it is well to remember that "[a] local ordinance is a municipal legislative enactment and the same canons of construction which we use in interpreting statutes are applicable to ordinances." (Internal quotation marks omitted.) *Connecticut Resources Recovery Authority* v. *Planning & Zoning Commission*, 46 Conn. App. 566, 571, 700 A.2d 67, cert. denied, 243 Conn. 936, 702 A.2d 640 (1997). Although the position of the commission is entitled to some deference, the interpretation of provisions in the regulations is a question of law for the court. *Coppola* v. *Zoning Board of Appeals*, 23 Conn. App. 636, 640, 583 A.2d 650 (1990).

"A court must interpret a statute as written . . . and it is to be considered as a whole, with a view toward reconciling its separate parts in order to render a reasonable overall interpretation. . . . A zoning ordinance is a local legislative enactment, and in its interpretation the question is the intention of the legislative body as found from the words employed in the ordinance." (Internal quotation marks omitted.) *Connecticut Resources Recovery Authority* v. *Planning & Zoning Commission*, supra, 46 Conn. App. 571. "The

words [employed] are to be interpreted according to their usual and natural meaning and the regulations should not be extended, by implication, beyond their expressed terms." *Coppola* v. *Zoning Board of Appeals*, supra, 23 Conn. App. 641. "The language of the ordinance is construed so that no clause or provision is considered superfluous, void or insignificant." *Connecticut Resources Recovery Authority* v. *Planning & Zoning Commission*, supra, 571.

We disagree with the plaintiff's interpretation of § 4-18. The first sentence of § 4-18 provides that "[t]he lot arrangement shall be such as to minimize foreseeable difficulties, for reasons of topography or other conditions, in securing building permits to build on all lots in compliance with the applicable zoning regulations and sanitary regulations, and in providing safe driveway access to buildings on such lots." The intent of the regulation is to reduce in degree or extent difficulties of the nature set out thereafter in the first sentence. The associated "difficulties" that are "foreseeable" are quite clear, especially given the acceptable meaning of "foreseeable" as "being such as may reasonably be anticipated . . . ." Webster's Third New International Dictionary.[18] It does not speak only to foreseeable difficulties in providing safe driveway access, but also to property or other conditions, and on the securing of building permits in compliance with zoning and sanitary regulations. The "foreseeable" difficulty as to the ledge rock is taken into consideration by the drafters of § 4-18 by providing relief from the two to one slope requirement where ledge rock "prevents" compliance with that ordinance.

The second sentence of § 4-18 provides that "[t]he applicant *must demonstrate* to the Commission that

---

[18] The word "foreseeability" is defined as the "quality of being reasonably anticipatable. . . ." Black's Law Dictionary (7th Ed. 1999).

cuts, fills and grades necessary to utilize the lots will not result in unsafe driveways or adversely affect adjacent properties, and that graded areas shall have a slope not exceeding one foot vertical in 2 feet horizontal, *unless ledge rock prevents*." (Emphasis added.) First, we point out that the applicant "must demonstrate" to the commission that certain activities on the lots will not result in unsafe driveways or adversely affect adjacent properties and also "demonstrate" that graded areas will have a slope not exceeding one foot vertical in two feet horizontal except where it is demonstrated that ledge rock prevents attaining the required slope. "Demonstrate" means "to make evident or reveal as true by reasoning processes, concrete facts and evidence, experimentation, operation, or repeated examples . . . ." Webster's Third New International Dictionary. "Demonstrate" is synonymous with "prove, show." Id.

We are persuaded that in the context within § 4-18, to demonstrate indicates futurity and not certainty. After all, in building development, developers accept, as part of the business, that land use agencies require tests of various natures so as to be reasonably assured that certain problems will not be encountered. "The law favors rational and sensible statutory construction. . . . The unreasonableness of the result obtained by the acceptance of one possible alternative interpretation of an [ordinance] is a reason for rejecting that interpretation in favor of another which would provide a result that is reasonable." (Citation omitted.) *Maciejewski* v. *West Hartford*, 194 Conn. 139, 151–52, 480 A.2d 519 (1984).

That reasoning also applies to the plaintiff's apparent claim that the commission views § 4-18 as structured so that it *requires* an applicant, at the subdivision approval stage,[19] to be faced with a "veto" of his application

---

[19] The plaintiff apparently insists, as he interprets § 4-18, that the commission requires the applicant to present evidence on matters that he simply is not in a position to present. On this record he evinces no persuasive

unless he has "conclusively proved" that "grading construction can obtain a one to two slope or that ledge rock will be encountered in *all* graded areas in sufficient amounts to allow a lesser grade." (Emphasis added.) Section 4-18 does not state that. First, the plaintiff's "conclusively proved" standard is ill chosen; this is civil litigation, and such a standard is not applicable. Nor is such language warranted by the "must demonstrate" requirement; that simply informs him that he must adduce evidence on his application at the public hearing of such a nature that demonstrates or proves and places in the record substantial evidence in support of his application.

"Substantial evidence," as defined by the cases that we previously have discussed, is hardly within the probative stratum of "conclusive proof." See *Beizer* v. *Dept. of Labor*, 56 Conn. App. 347, 357, 742 A.2d 821, cert. denied, 252 Conn. 937, 747 A.2d 1 (2000). For example, "[s]ubstantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred." Id. The commission's factual determination must be sustained if it is reasonably supported by substantial evidence in the record taken as a whole. *Connecticut Resources Recovery Authority* v. *Planning & Zoning Commission*, supra, 225 Conn. 744; *Beizer* v. *Dept. of Labor*, supra, 357.

In sum, we do not agree with the plaintiff that § 4-18 lacks a standard that affords a valid basis for the commission to use in passing on the propriety of a resubdivision application and that it leaves the fate of such applications to the subjective views of commission members. The regulation provides that an applicant

reason for such a position. His seeming bifurcation of those matters that he is reasonably required to address *now* on his application and his site plans, as opposed to that which he says he only has to demonstrate at the actual development stage, cannot be accepted.

must demonstrate, i.e., prove, certain matters. Those include that cuts, fills and grades necessary to use the lots will not result in unsafe development or adversely affect adjacent properties," and that "graded areas shall have a slope not exceeding one foot vertical in two feet horizontal, *unless ledge rock prevents.*" (Emphasis added.) There is no issue raised about the plaintiff's and the commission's understanding about what "unsafe driveway" means,[20] nor is anyone attacking the language about use of those lots "adversely affecting adjacent properties." Those words are plain and clear.

In like manner, the last portion of the second sentence in § 4-18, the provision that states "that graded areas shall have . . . *unless ledge rock prevents*"; (emphasis added); which is focal in this appeal, is also unambiguous in its meaning. The "unless" clause provides an applicant with the opportunity for relief from the slope requirement. That, of course, is subject to the plaintiff, demonstrating that the ledge rock prevents compliance by "substantial evidence," which, as pointed out, is not at all the "conclusively proven" standard of proof of which the applicant complains. The standard in § 4-18 is thus reasonably sufficient fairly to apprise the applicant, the commission and the public of the circumstances under which an exception will be permitted. We therefore not only disagree with the plaintiff's claim regarding the standard applicable to § 4-18, but also his argument that the commission misread that regulation.

The judgment is reversed and the case is remanded with direction to render judgment dismissing the plain-

---

[20] The plaintiff further posits that § 4-18, considered as a whole, was designed for "providing safe driveway access to the buildings on such lots" and that because the proposed driveways on the lots meet all of the standards set forth in the regulations, the commission should have approved his plan. A plain reading of the unambiguous language of § 4-18 does not support the plaintiff's claim here.

tiff's appeal from the denial of his resubdivision application.

In this opinion the other judges concurred.